

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| ROSE COTTONARO, | ) | |
| | ) | |
| Respondent, | ) | |
| v. | ) | WD86114 |
| | ) | |
| | ) | OPINION FILED: |
| EXPRESS MEDICAL | ) | March 12, 2024 |
| TRANSPORTATION, INC., | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Charles H. McKenzie, Judge**

**Before Division Two:** Anthony Rex Gabbert, Presiding Judge, and
Karen King Mitchell and Janet Sutton, Judges

Express Medical Transportation, Inc. (Express) appeals from a judgment finding it

negligent and awarding Rose Cottonaro compensatory and punitive damages. Express

raises two points on appeal. First, Express asserts the trial court erred in admitting

evidence of three "other similar incidents" (OSIs) involving Express because those

incidents were not substantially similar to Cottonaro's incident in that the OSIs involved

different drivers, vehicles, and specific means of alleged injury. Second, Express argues

the court erred in submitting Cottonaro's claim for punitive damages to the jury because

that claim was based solely on the OSI evidence that was insufficient to support

submission. Because Express failed to properly preserve its first point, and that point is dispositive, we affirm the trial court's judgment.

## Background

Express provides non-emergency medical transportation for individuals who need to be transported via wheelchair or stretcher. On July 5, 2019, Express transported Cottonaro from her home in Harrisonville, Missouri, to Sarah Cannon Cancer Center at Research Medical Center in Kansas City, Missouri. At the time, Cottonaro was approximately 83 years old and used a wheelchair.

Approximately thirty minutes into the drive, Express's van stopped at a red light near the Cancer Center. When the light turned green and the van accelerated, Cottonaro's wheelchair moved backwards, and she hit her head. Express's driver (Driver) took Cottonaro to the emergency room, where she underwent a CT scan and was treated for a cut on her leg. The results of the CT scan were normal, and the cut did not require stitches. It took a couple of months for the "goose egg" on her head to resolve; she also reported some neck and hip pain but did not seek additional medical treatment.

Cottonaro filed a petition against Express and Driver on December 23, 2019, and an amended petition on July 24, 2020. The amended petition included claims for negligence against Express and Driver and claims for negligent hiring/supervision/direction and punitive damages against Express only. On Express's motion, the trial court issued an order bifurcating the trial as to Cottonaro's claim for punitive damages.

2

At trial, Express's corporate designee (Designee) explained how Express's drivers are trained to secure wheelchairs for transport in its vans. Designee testified that each van has four floor-mounted anchors or bolts, two in front and two in back. The driver first engages the brakes on the wheelchair and then hooks each anchor to the wheelchair's frame—the right front anchor to the right front of the frame, the left front anchor to the left front of the frame, the right rear anchor to the right rear of the frame, and the left rear anchor to the left rear of the frame. The driver then tightens the restraints by pulling on them to make sure they are tight. The only way to release the restraints is to push the red release button. Then, the driver attaches and secures a safety belt around the passenger. Once the wheelchair and the passenger are secured, the driver shakes the chair from behind to make sure there is no more than two inches of movement in any direction.

Designee also testified about the training Driver received. According to Designee, Express's employee handbook specified that new drivers receive a minimum of two weeks of on-the-job training, but the company's practice was to provide between five and ten days of initial training. In Driver's case, she rode with a veteran driver for five days, observing for the first three days and then, for the last two days, performing all tasks on Express's training checklist. Designee explained that Driver "would have got[ten] intense training . . . on securing the wheelchair since that is the most important thing . . . we do."

According to Designee, following Driver's five days of on-the-job training, Driver performed a test run with an Express manager who observed as Driver again completed the tasks on the training checklist. Designee then met with Driver for "hours" of "pretty

3

intense" training on a range of safety topics. The final step in the initial training process involved Driver pushing Designee in a wheelchair, securing the wheelchair in the van, and taking a test drive with Designee. Designee also testified that all Express drivers attended bi-monthly training meetings on a variety of topics, including wheelchair securement.

The trial court permitted Cottonaro's counsel to introduce, through Designee's testimony, evidence of three OSIs all involving allegations of failure to properly secure a passenger.[1] Express claimed all three of those passengers, like Cottonaro, were properly secured by the drivers using the same restraint system and all the other drivers received

---

[1] Before trial, Express filed motions in limine seeking to exclude evidence of five OSIs based on lack of substantial similarity between those incidents and the Cottonaro incident. After extensive argument, the trial court denied those motions as to the three OSIs at issue on appeal. However, the court explained that denying the motions

> does not mean that I am, you know, determining the admissible element of evidence to get it in. And I don't think I know enough about that necessarily, . . . there's different ways to get in that type of evidence and I encourage you to be prepared to do it in a proper way.
> . . .
> I find in an operative way only as a motion in limine that I'm going to deny it [as to the three OSIs at issue on appeal], as I stated. That doesn't mean it's just whatever way you want to put it in is admissible, you're going to have to figure that out for yourself. And that evidence has to be otherwise admissible, one way or another.
> . . .
> I mean, and that's just also based upon the operative facts as presented.
> This ruling is interlocutory and could be reconsidered if I know more.

In its written order denying the motions in limine as to the three OSIs at issue, the court wrote, "[W]ith adequate foundation, Plaintiff, and her counsel, may question Defendants' representatives about [the three OSIs] at trial. Specific objections to the admissibility of th[ose] incidents . . . will be addressed as they arise."

4

the same securement training as Driver. Designee also testified that she really did not receive complaints about passengers being improperly secured and injuries to Express's passengers are "very rare."

Driver, who worked for Express for roughly eight months beginning in January 2019, testified that she rode with a veteran driver for a week and then with an Express manager for a day. Driver also completed a CPR course. Driver confirmed that Express offered safety reviews, but she did not mention a training session or a demonstration with Designee.

As for the incident at issue, Driver testified that she wheeled Cottonaro, who was traveling in her own wheelchair, up the ramp into the van, placed the wheelchair in position, and locked the wheelchair's wheels.[2] Next, Driver strapped the Q-Straints to the frame of the wheelchair starting with the front of the wheelchair and moving to the back. Driver then twisted and locked the restraints. Lastly, Driver pulled on the restraints to confirm that they were locked.

When Driver arrived at the intersection where the incident occurred, the traffic light was red, so she stopped the van. The GPS app on her cell phone made a noise, so she touched the screen to enlarge the message. When she looked up, the light was still red. When the light turned green, Driver accelerated and proceeded to make a turn. As she did so, she heard the restraints click, which meant they were tightening. Driver

---

[2] Driver had difficulty engaging the wheel locks on Cottonaro's wheelchair, prompting Driver to suggest that Cottonaro have someone check her brakes. Eventually, Driver was able to engage the brakes.

looked in the rearview mirror and saw that something was wrong, so she pulled over to the side of the road. Cottonaro's wheelchair had shifted backwards, but had not completely tipped over.[3]

Cottonaro testified that Driver arrived late to pick her up, and Cottonaro was very nervous that she was going to miss her appointment at the Cancer Center. Cottonaro believes she was the one who applied the brakes on her wheelchair, and she did not see whether Driver secured the front frame of the wheelchair using the Q-Straints. As for the incident itself, Cottonaro testified, "it felt like [Driver] stomped on the gas and when she done that I flew backwards. I was laying on the floor of the van."[4]

Express moved for a directed verdict at the close of Cottonaro's evidence and the close of all evidence, arguing, in part, that there was insufficient evidence to support submission of Cottonaro's punitive damages claim to the jury.[5] The court denied those motions. The jury found Express liable for negligence and awarded Cottonaro $75,000 in

---

[3] Driver testified that she looked at her phone only to check the message on GPS, but Cottonaro's traveling companion (Companion) who sat in the front passenger seat of the van next to Driver, testified that Driver checked her phone every few minutes as she drove and appeared to be texting. According to Companion, Driver was texting at the red light, looked up, realized the light had turned green, and "floored the van," sending Cottonaro "flailing backwards."

[4] Consistent with Cottonaro's testimony, Companion testified that Cottonaro's "wheelchair was totally on its back, and . . . her feet were up in the air."

[5] The transcript indicates that Express filed a written motion for directed verdict but that motion is not in the legal file. Express, "as appellant, has the duty to provide a complete record on appeal for the determination of questions presented to the appellate court." *Baumgartner v. Bi-State Dev. Agency*, 811 S.W.2d 63, 65 (Mo. App. E.D. 1991).

compensatory damages.[6]  The jury also found Express liable for punitive damages. Following a separate trial on punitive damages, the jury awarded Cottonaro $250,000.

Express filed a motion for new trial on three grounds, including trial court error in admitting OSI evidence because the three OSIs were not substantially similar to the incident involving Cottonaro and trial court error in submitting her punitive damages claim to the jury.  The court denied the motion, and this appeal follows.  Additional facts will be provided in the analysis, as necessary, to address Express's points on appeal.

## Analysis

Express raises two points on appeal, but Cottonaro argues that Express failed to properly preserve either point.  Thus, before addressing the merits of Express's arguments, we must determine whether its points on appeal were properly preserved.

### I.      Express did not properly preserve its first point challenging admission of the OSI evidence.

For its first point, Express asserts the trial court erred in admitting evidence of the OSIs because those incidents were not substantially similar to the incident at issue in that the OSIs involved different drivers, vehicles, and specific means of alleged injury.[7] Cottonaro argues that Express failed to object to the OSI evidence at trial and, thus, failed to preserve the issue for appeal.  Express responds that it properly objected to the

---

[6] Before the case went to the jury, Cottonaro dismissed Driver.

[7] Express's first point also alleged trial court error in denying Express's motion for new trial on the issue of OSI evidence.  On the eve of oral argument, Express filed a motion for permission to strike or, in the alternative, amend Point I to remove the words "and denying Express' motion for new trial" so as to prevent the point from being multifarious.  We took the motion with the case.  In view of our disposition of Point I, we now deny the motion to strike/amend Point I.

admission of OSI evidence by filing pretrial motions in limine arguing that such evidence should be excluded.

"The trial court's ruling on a motion in limine is a preliminary ruling on the admissibility of evidence and is subject to change throughout the course of trial." *Church v. CNH Indus. Am. LLC*, 671 S.W.3d 829, 842 n.4 (Mo. App. W.D. 2023) (quoting *Gaal v. BJC Health Sys.*, 597 S.W.3d 277, 290 (Mo. App. E.D. 2019)). Thus, "to properly preserve for appeal the admission of evidence complained of in a motion in limine, the party challenging the evidence must also object at trial." *Id.* (quoting *Gaal*, 597 S.W.3d at 290). Moreover, "[t]he failure to object at the trial on the same basis as that asserted on appeal fails to preserve that issue for appellate review." *Id.* at 841 (quoting *Thomas v. Harley-Davidson Motor Co. Grp., LLC*, 571 S.W.3d 126, 135 (Mo. App. W.D. 2019)).[8]

---

[8] Express urges us to conclude that Point I was properly preserved under *Swartz v. Gale Webb Transportation Co.*, 215 S.W.3d 127 (Mo. banc 2007) and *Longshore v. City of St. Louis*, 699 S.W.2d 16 (Mo. App. E.D. 1985). Those cases recognize an exception to the requirement to object to each piece of evidence or request a continuing objection where the court's position is clearly established. But that exception does not apply here for two reasons. First, the exception applies "when testimony on a particular subject is objected to the first time it is offered and the court makes clear that it is rejecting the objection to all evidence of the same type." *Swartz*, 215 S.W.3d at 133. The Court further explained, "[i]n such cases, a failure to specifically object to each later piece of similar testimony may be forgiven on the basis that further objection would have been futile." *Id.* When the evidence was offered at trial, Express did not object to *any* of the offered OSI evidence (with the exception of the video of the third OSI as explained below) on the grounds of lack of similarity. Thus, this is not a situation where an initial objection was made and overruled. Second, neither the trial court's written order nor its ruling from the bench on the motion in limine indicated that the court's position to admissibility of the OSI evidence was "clearly established" such that an objection at trial would have been futile. In fact, the court made clear that its ruling on the motion in limine was open to reconsideration based on evidence adduced at trial and essentially indicated that it would entertain any objection Express wanted to make at trial.

Thus, to determine whether Point I was properly preserved, we must examine the timing and nature of Express's trial objections to admission of the OSI evidence.

During Cottonaro's opening statement, her counsel said, "The [first] incident and the allegation of that incident, is that an unsecured passenger in 2018 [wa]s being taken by an [Express] driver, [and the passenger was] not properly secured. And in that trip[,] [the passenger] died from those injuries at the hospital." Counsel for Express objected, arguing that plaintiff's counsel was asserting causation when no evidence of causation would be offered at trial. The court sustained the objection but allowed Cottonaro's counsel to couch his description of the 2018 incident as an allegation. The court then issued the following curative instruction: "Ladies and Gentlemen, there was an objection to the last statement of counsel regarding this previous incident that he is referencing. I sustain that objection and I instruct the jury to disregard that—those statements and I'm going to let him restart on that incident." Later in his opening statement, Cottonaro's counsel described allegations involving both the first OSI and another OSI without objection from defense counsel.

During Designee's testimony, Cottonaro's counsel inquired about the first OSI. Designee confirmed that Express had transported a passenger on February 6, 2018, but when asked to confirm that the passenger had not been properly secured and, as a result, he had fallen, broken both legs, and died the next day, Designee testified that she was not familiar with the case, but she did recall that the passenger had died. Express's counsel objected on the basis of lack of foundation to asking a non-medical person about the cause of death. Cottonaro's counsel agreed to rephrase the question, and the court

9

instructed the jury to disregard that question. Later, Express's counsel objected to a question about an allegation in a petition arising from the first OSI; the court allowed Cottonaro's counsel to withdraw the question and ask another question about that OSI. Express did not object to the substance of the testimony or the similarity of the first OSI to the incident involving Cottonaro.

As for the second OSI, Designee testified that Express transported a passenger in March 2019. Designee recalled that the passenger was "a small lady, I think she weighed about 88 pounds. She had just suffered from a stroke." She was being transported from the University of Kansas Medical Center to St. Joseph Medical Center for rehabilitation. The allegation in that case was that the passenger was not properly secured in her wheelchair. Express's internal investigation revealed that the passenger should have been transported via stretcher, but the equipment to be used is a decision made by the treating physician and not by Express. Express did not lodge any objection at trial to testimony about the second OSI.

The third OSI occurred on July 11, 2022, more than three years after the Cottonaro incident. Designee testified that the passenger involved in the third incident "was a large lady" who was being transported in a reclining wheelchair called a geri-chair, which is secured in an Express van in the same way a wheelchair is secured. When the passenger was wheeled to the van, she was sitting straight up in the geri-chair. Roughly ten minutes into the drive, the geri-chair moved, and the passenger fell forward. Cottonaro's counsel moved to admit an incident report concerning the third OSI, to which Express's counsel responded, "no objection."

10

In 2020, Express installed video systems in all its vans, so the third OSI was recorded. Cottonaro's counsel offered the video into evidence, and Express's counsel objected to the video being played for the jury. In explaining his objection, Express's counsel said, "[Designee] didn't deny that it occurred, and she explained what her investigation was. And the video—there's no other purpose for the video, it's just too prejudicial." He continued, "[The video] is extremely prejudicial, there's no probative value for the video with all the other testimony we've had about this incident." The court overruled the objection, and the entire video was played for the jury. After the video was shown, Designee continued to testify to the incident and what was depicted in the video. Although in objecting to the playing of the video, Express's counsel argued that the incident depicted in the video was dissimilar to Cottonaro's incident, he did not object to Designee's prior testimony about the third OSI on the basis of lack of similarity.

The only other objection related to the third OSI pertained to a question posed to Designee as to whether the passenger made a "complaint" against Express. Express objected because the word "complaint" could infer litigation. Cottonaro's counsel agreed to rephrase the question, and the court instructed the jury to "disregard the last question and [Cottonaro's counsel] will ask another question."

Express could have objected on the basis of either lack of similarity or relevance each time Cottonaro presented OSI evidence, or Express could have objected to the initial presentation of such evidence and requested a continuing objection, but Express did neither. In fact, Express did not object on any basis until Designee had already testified about the facts of each OSI. "Under Missouri law, objections must be made at the

11

earliest possible opportunity, and failure to object constitutes waiver of the claim on appeal." *Church*, 671 S.W.3d at 841 (quoting *State v. Jones*, 637 S.W.3d 526, 535 (Mo. App. W.D. 2021)). Additionally, as to the third OSI, Express specifically stated that it had no objection to admission of an incident report, and "[a]n announcement of 'no objection' when evidence is sought to be admitted waives appellate review." *Id.* at 841-42 (quoting *D.R. Sherry Const., Ltd. v. Am. Fam. Mut. Ins. Co.*, 316 S.W.3d 899, 906 (Mo. banc 2010)). Thus, Express's claim of error in admitting the OSI evidence is not preserved for our review.

"When an issue is 'not properly preserved for appellate review, the only review, if any, would be for plain error, in accordance with Rule 84.13(c).'" *Washington v. Sioux Chief Mfg. Co., Inc.*, 662 S.W.3d 60, 76 (Mo. App. W.D. 2022) (quoting *Cohen v. Express Fin. Servs., Inc.*, 145 S.W.3d 857, 864 (Mo. App. W.D. 2004)). "Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." *Id.* (quoting Rule 84.13(c)). "In determining whether to exercise its discretion to provide plain error review, the appellate court looks to determine whether there facially appears substantial grounds for believing that the trial court committed error that is evident, obvious and clear, which resulted in manifest injustice or a miscarriage of justice." *Id.* at 76-77 (quoting *Cohen*, 145 S.W.3d at 864). "If[,] in applying this standard[,] the appellate court chooses to exercise its discretion to conduct plain error review, the process involves two steps." *Id.* at 77 (quoting *Cohen*, 145 S.W.3d at 864). "First, the court must determine whether the trial court actually

committed evident, obvious and clear error that affected substantial rights." *Id.* (quoting *Cohen*, 145 S.W.3d at 864). "[I]n the second step of reviewing for plain error, the court must determine whether the evident, obvious, and clear error found resulted in manifest injustice or a miscarriage of justice." *Id.* (quoting *Cohen*, 145 S.W.3d at 865).

"The plain error rule should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review." *Id.* (quoting *Cohen*, 145 S.W.3d at 865). "As a practical matter, we rarely resort to plain error review in civil cases." *Id.* (quoting *Cohen*, 145 S.W.3d at 865). "Furthermore, the plain error doctrine cannot be used to revive issues already abandoned by selection of trial strategy or oversight." *Id.* (quoting *Cohen*, 145 S.W.3d at 865).

Express failed to object to the admission of the OSIs on the basis now raised in its appeal—lack of similarity to the underlying incident. Like the defendant in *Church*, Express "also has not asked this Court to consider its argument for plain error and thus has not provided us any reason to do so."[9] *Church*, 671 S.W.3d at 842. Thus, as we did in *Church*, we decline to review the issues raised in Point I for plain error.

Point I is denied.

---

[9] Express's reply brief includes one paragraph arguing that admission of the OSI evidence constituted plain error, but "[a]ssignments of error set forth for the first time in the reply brief do not present issues for appellate review." *Swafford v. Treasurer of Mo.*, 659 S.W.3d 580, 585 n.7 (Mo. banc 2023) (quoting *Berry v. State*, 908 S.W.2d 682, 684 (Mo. banc 1995)).

## II. Because we deny Point I, we need not reach Point II.

For its second point, Express contends the court erred in submitting Cottonaro's claim for punitive damages to the jury because that claim was based solely on the OSI evidence which should not have been admitted. At oral argument, counsel for Express stated that it was clear from Express's briefs that Point II is contingent on the success of Point I such that, if we were to deny Point I, we need not reach Point II. In other words, Express concedes that, if we affirmed the admission of the OSI evidence, there was sufficient evidence to support submission of punitive damages to the jury. Thus, because we denied Point I, and Express concedes that Point II is contingent on the success of Point I, we do not reach Point II.

Point II is denied.[10]

---

[10] Cottonaro argues that Express failed to properly preserve Point II by filing a Rule 78.01 motion for new trial instead of a Rule 72.01 motion for judgment notwithstanding the verdict (JNOV). Rule 72.01(b) (2022) states,

> Not later than thirty days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the motion for a directed verdict . . . . A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed.

In its motion for new trial, Express alleged, among other things, that the trial court erred (1) in admitting the OSI evidence due to lack of similarity and (2) in submitting the punitive damages claim to the jury based solely on the inadmissible OSI evidence. These alleged errors are intertwined. The remedy for the first alleged error—admission of the OSI evidence—would be a new trial. Had Express prevailed on that issue and been granted a new trial, Cottonaro could have offered additional evidence supporting her claim for punitive damages. Thus, had Express been granted a new trial on the OSI issue,

## Conclusion

Because Express failed to properly preserve Point I, and that point is dispositive, the trial court's judgment is affirmed.

_Karen King Mitchell_
Karen King Mitchell, Judge

Anthony Rex Gabbert, Presiding Judge, and Janet Sutton, Judge, concur.

---

the punitive damages claim might have been submitted to the jury based on the evidence adduced at the new trial. Because these alleged errors are so closely linked, we decline to conclude that Express per se failed to preserve its challenge to the submissibility of Cottonaro's punitive damages claim merely because Express combined the two alleged errors in a single motion for a new trial. Had Express argued that, even if the OSI evidence was properly admitted, there was insufficient evidence to support submission of the punitive damages claim to the jury (a claim Express does not make), we would have to determine whether, by seeking a new trial on the punitive damages claim, Express had sought the appropriate relief or whether Express had to seek a JNOV. Because Express acknowledges that its claim that punitive damages should not have gone to the jury was contingent on a finding that the court erred in admitting the OSI evidence, we need not reach this issue. Thus, we reject Cottonaro's argument that Express failed to preserve Point II simply because Express raised the alleged error in a new trial motion and not in a separate JNOV motion.

15